## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY MARCH and RUSSELL MARCH,** | : | CIVIL ACTION |
| h/w | : | |
| 475 Lisa Drive | : | |
| West Chester, PA 19380 | : | |
| | : | NO. 2:18-cv-02774-PD |
| AND | : | |
| | : | |
| **JARED SAVITSKI** | : | PAUL S. DIAMOND, J. |
| 758 Chessie Court | : | |
| West Chester, PA 19380, | : | |
| | : | |
| on behalf of themselves and all others | : | |
| similarly situated. | : | |
| | : | |
| **PLAINTIFFS** | : | |
| v. | : | |
| | : | |
| **SUNOCO PIPELINE L.P.** | : | |
| 3807 West Chester Drive | : | |
| Newtown Square, PA 19073 | : | |
| | : | |
| AND | : | |
| | : | |
| **ENERGY TRANSER PARTNERS, L.P.** | : | |
| f/k/a Sunoco Logistics Partners L.P. | : | |
| 8111 Westchester Drive | : | |
| Dallas, TX 75225 | : | |
| | : | |
| **DEFENDANTS** | : | |

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Mary and Russel March, and Jared Savitski (collectively, "Plaintiffs"), by their

undersigned counsel, allege (based upon the investigation of their counsel) as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and as a Class Action pursuant to

Pa.R.C.P. 1702 or Fed.R.Civ.P. 23, [1] on behalf of a similarly situated Class, which is

defined as follows:

> All persons, both natural and legal, that own, lease and/or lawfully occupy
>
> the real property situated within two thousand five hundred feet (2500) of
>
> 40.021489, -75.612514.

2.     Defendants, Sunoco Pipeline L.P. and Energy Transfer Partners, L.P., f/k/a Sunoco

Logistics Partners L.P. (together, "Sunoco" or "Defendants"), are engaged in the

installation, maintenance, and operation of an underground pipeline connecting gas

drilling operations in western Pennsylvania with refining operations located in

Philadelphia, Pennsylvania.

3.     Defendants employed and continue to employ a process known as horizontal directional

drilling (HDD) to install the underground pipeline.

4.     Defendants employed or contracted with Tetra Tech, Inc. and Groundwater &

Environmental Services, Inc. (hereinafter "GES"), which are engaged in many aspects of

the planning, permitting, consulting, evaluation, siting, analysis and operation of pipeline

drilling projects, such as that engaged in by Sunoco in relation to the pipelines at issue in

this case.

---

[1] As of the date of this filing, Plaintiffs' Motion to Remand this action back to Philadelphia County Court of Common Pleas remains pending.  Accordingly, where applicable, Plaintiffs plead their allegations in the alternative.

5.     Defendants' negligent use of horizontal directional drilling caused destruction of Plaintiffs' properties, undermined the lateral support of Plaintiffs' properties and exposed Plaintiffs to harms and losses.

6.     Plaintiffs have suffered and continue to suffer, among other things, physical damage to their property, the loss of the use and quiet enjoyment of their property, and impairment of the value of their homes, as a result of Defendants' conduct.

## II.     PARTIES

7.     Russell March is an adult citizen of the Commonwealth of Pennsylvania who resides at and owns a parcel of land known as 475 Lisa Drive, West Chester, PA 19380 (the "March Property").

8.     Mary March is an adult citizen of the Commonwealth of Pennsylvania who resides at and owns the March Property.

9.     Russell March is married to Mary March.

10.    Jared Savitski is an adult citizen of the Commonwealth of Pennsylvania who resides at and owns a parcel of land known as 758 Chessie Court, West Chester, PA 19380 (the "Savitski Property").

11.    Defendant, Sunoco Pipeline L.P., was at all times material hereto a limited partnership, organized and existing under the laws of the State of Texas and appears to have a principal place of business in Newtown Square, PA.

12.    Defendant, Energy Transfer Partners, L.P., f/k/a Sunoco Logistics Partners L.P., was at all times material hereto a publicly traded master limited partnership, organized and existing under the laws of the State of Delaware and appears to have a principal place of business in Newtown Square, PA.

3

### III.    VENUE

13.    Venue is proper in Philadelphia County's Court of Common Pleas or the Eastern District of Pennsylvania.  For years, Sunoco has maintained a refinery in Philadelphia County. Defendants continue to maintain an interest in that refinery through various corporate entities.

14.    For years, Sunoco maintained offices in Philadelphia County at 1818 Market Street, Philadelphia, PA.

15.    Sunoco's oil and gas products regularly traverse Philadelphia County by truck, pipeline or other means of transport.  Defendants are regularly doing business in Philadelphia County.

16.    Defendant Sunoco maintains multiple gas service stations throughout Philadelphia County.

### IV.    CLASS ACTION ALLEGATIONS

17.    Plaintiffs will fairly and adequately assert and protect the interests of the Class.

18.    Plaintiffs have retained competent counsel who are well versed in the relevant legal and factual issues presented in this matter.

19.    A class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Pa.R.C.P. 1708 or Fed.R.Civ. P. 23.

20.    Common questions of law and fact exist as to all members of the Class and such issues predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the Class are:

    a.    Whether Defendants conducted drilling operations in a negligent manner;

b. Whether Defendants violated state environmental laws applicable to their drilling operations;

c. Whether Defendants' violation of state environmental laws renders their drilling operations negligent per se;

d. Whether Defendants' drilling operations caused a private nuisance;

e. Whether Defendants negligently hired, trained and supervised their agents, employees, workmen, contractors, subcontractors and other personnel involved in drilling operations;

f. Whether Defendants' drilling operation has resulted in trespass to Plaintiffs' property or leaseholds;

g. Whether Defendants' drilling operation has undermined the lateral support of Plaintiffs' property or leaseholds; and

21. Plaintiffs' claims are typical of the claims of their fellow Class members because: (1) Plaintiffs and members of the Class have suffered similar harm as a result of Defendants' actions and inactions; (2) Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants; and (3) Defendants engaged in a common course of conduct that did not vary from plaintiff to plaintiff.

22. The members of the Class are so numerous that joinder of all Class members is impracticable.

23. Administration of a class action will not be difficult.

24. The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the class that would, as a

practical matter, be dispositive of the interests of other members not parties to the adjudications.

25.     Upon information and belief, there are no claims pending against Defendants arising from the conduct described herein.

26.     Philadelphia County is the appropriate forum for the litigation of the claims of the Class because Defendants conduct business in Philadelphia County.

27.     The complexity of the issues presented in this litigation, the expenses associated with litigating the same, and the amount of damage Plaintiffs and members of the Class have suffered make it a practical impossibility to bring separate actions on behalf of members of the Class.

28.     It is likely that the amount recovered by individual Class members will justify the expense and effort of administering a class action.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS

29.     Sunoco is an interstate carrier of crude oil, gasoline, and natural gas liquids such as propane, butane, and ethane.

### The Mariner East Pipeline Project

30.     Upon information and belief, at some time prior to December 2012, Sunoco conceived the so-called Mariner East Project for the purpose of entering the business of transporting natural gas liquids ("NGL's"). NGL's are compounds, including ethane, propane, and butane, that are byproducts of recovering natural gas or oil through a process known as hydraulic fracturing ("fracking"). The Mariner East Project would carry NGL's from Ohio, West Virginia, and western Pennsylvania eastward toward the Philadelphia area.

31.     In 2012, Sunoco received approval from the Federal Energy Regulatory Commission for a new pipeline project, referred to as the Mariner East 1 pipeline ("Mariner 1"), which would transport NGL's from the shale fields of Ohio and West Virginia, across Pennsylvania and to a terminal situated both in Pennsylvania and Delaware for the purpose of shipping to markets outside the Commonwealth.

32.     Sunoco's website states, in pertinent part, that Mariner 1:

> ….is [a] pipeline project to deliver propane and ethane from the liquid-rich Marcellus Shale areas in Western Pennsylvania to the Marcus Hook facility, where it will be processed, stored, and distributed to various domestic and waterborne markets. The project is anticipated to have an initial capacity to transport approximately 70,000 barrels per day of natural gas liquids and can be scaled to support higher volumes as needed.

33.     In 2014, Sunoco's new Mariner East 2 pipeline project ("Mariner 2") also received federal approval.

34.     The purpose of Mariner 2 is to transport propane and ethane from processing and fractionation complexes in Western Pennsylvania, West Virginia, and Eastern Ohio to a facility in Marcus Hook, Pennsylvania.

35.     Sunoco owns an easement ("Easement") through several residential neighborhoods located in West Chester, Pennsylvania.

36.     Sunoco intends to run Mariner 1 and Mariner 2 though the Easement.

37.     Sunoco chose to perform the drilling required for Mariner 1 and Mariner 2 using a technology called horizontal directional drilling (HDD).

38.     HDD uses high pressure water, mud and chemicals to break up rock formations and soil.

Sunoco's Use of HDD through the Easement
Causes an Underground Explosion of Pressurized Drilling Fluids

39.     Safe usage of HDD requires a competent and professional analysis of the underground

geology and other structures through which to pass HDD.

40.     Failure to properly or correctly analyze and account for the underground geology and

other structures can result in damage to underground structures that can manifest on the

surface.

41.     Sometime prior to March 1, 2017, Sunoco was using HDD to bore though the subsurface

ground in the area of the March Property.

42.     The Lisa Drive Development sits on a limestone, karst, or other formation made up of

porous rock types.

43.     An underground fissure, void, fault, or other change in the solidity and consistency of the

subsurface rock exists in the vicinity of the March Property.

44.     Sunoco knew or should have known prior to drilling that there was an underground fissure

in the area of the March Property.

45.     The failure to identify and avoid this fissure is a serious failure and below the standard of

care on the part of Sunoco's engineers or geologists or their agents, servants, and

employees responsible for these tasks or judgments.

46.     Sunoco chose to use a construction technology in an area without sufficient geologic study

and without determining the limits of the technology as they pertained to the Plaintiffs'

area.

47.     Alternatively, Sunoco may have identified the fissure and chose to drill through the area

of the fissure, without notifying residents in the area of the risks of their plan to drill

through an underground fissure.

48.   Sunoco knew or should have known that the impact on an underground fissure or void with HDD would more likely than not result in an uncontrolled explosion of drilling fluids.

49.   On or about November 11, 2017, Sunoco drilled through the underground fissure or void in the area of the March Property, causing a sink hole and spilling drilling mud over the adjacent properties.

50.   On November 11, 2017, an underground explosion of drilling fluid occurred immediately adjacent to the March Property.

51.   The underground explosion occurred at approximately 40.021489, -75.612514 ("Epicenter").

52.   The explosion caused significant damage to the underground structures at the Epicenter and surrounding areas.

<u>The Underground Explosion Causes Property Damage at the Surface</u>

53.   The damage to the underground structures has manifested itself and continues to manifest itself in a variety of ways.

54.   The underground explosion followed by testing of the pipe has caused geysers of drilling fluids in the area around the Epicenter, releasing fluids with contaminants across the land of Plaintiffs and members of the Class.  A photo of the scene is annexed hereto.

55.   The toxicity and health effects of the geysers may pose a danger to human health depending on what drilling fluids were in use at the time of the underground explosion (which Plaintiffs will determine through discovery).

56.   The underground explosion has caused five or more sinkholes and will continue to cause depressions and may cause additional sink holes to develop on the property of Plaintiffs and members of the Class.

57.    Multiple sinkholes have appeared and continue to appear within two thousand five hundred feet (2,500) of the Epicenter.

58.    The sinkholes have caused and continue to cause damage to structures and other improvements on the property of Plaintiffs and members of the Class.  For example, Plaintiffs and members of the Class have experienced cracking in the walls, chimneys and driveways of their homes.

59.    The sinkholes and disruption to the underground structures have also created a risk to the man-made infrastructure in the area.

60.    The underground explosion may have destabilized an existing natural gas pipeline.  This destabilization has created an imminent risk of a catastrophic explosion caused by the ignition of gas escaping from the existing line.  Hundreds, if not thousands, of class members live within a zone described by regulatory authorities as the "blast zone", if the pipeline were to be undermined and explode.

61.    The underground explosion may have destabilized the water and sewer lines serving the property of Plaintiffs and members of the Class, such that Aqua has been forced to perform emergency remediations at multiple points on the pipeline path to prepare for collapse of its lines.

62.    Sunoco was fined $12 Million dollars in connection with violation of numerous environmental regulations associated with its decision to perform HDD beyond the scope of its permits.

The Underground Explosion and Attempted
Cleanup Causes Additional Damage to Underground Structures

63.    Shortly after the first sinkhole appeared, Sunoco and various governmental authorities appeared to evaluate the situation.

10

64.   Since that time, security fencing has covered the location of the first sinkhole.

65.   This is an eyesore and reduces the Plaintiffs' and members of the Class's use and enjoyment of their property.

66.   The underground explosion and appearance of sinkholes was reported upon by the local print and television media, raising public concern about the pipeline and resulting in decline in the property values of Plaintiffs and members of the Class.

67.   Following the underground explosion, Sunoco viewed the damage that it had caused to the property of Plaintiffs and members of the Class and began a response.

68.   On or about March 2, 2018, Sunoco advised residents that it would begin testing the pipe that it had blasted through the subsurface.

69.   Sunoco's testing resulted in additional damage to the underground structures and four additional sinkholes developed on the property of Plaintiffs and members of the Class.

70.   Without permission of the Pennsylvania Department of Environmental Protection ("DEP") or the Pennsylvania Public Utility Commission ("PUC"), Sunoco pumped eight or more cement trucks full of cement grout into several of the sinkholes.

71.   DEP and PUC immediately applied for a stop work order which was granted against Sunoco.

72.   After the appearance of the sinkholes, Sunoco workers inundated the neighborhood of the Class members.

73.   The neighborhood was besieged by men in pickup trucks from Texas, New York, Arkansas, and other faraway places.

74.   The neighborhood was dug up by backhoes in an emergency effort to discover the full extent of the disaster wrought by Sunoco.

75. The underground has been so altered by Sunoco's sinkholes that DEP and PUC are concerned about imminent and catastrophic hazard to Plaintiffs and members of the Class arising from the damage to the existing natural gas pipeline.

76. Sunoco has been required to install multiple seismic monitors throughout the neighborhood, including on the property of plaintiffs, because of regulators' concerns that the pipeline will shift and explode.

<u>Damages Suffered by Plaintiffs and Members of the Class</u>

77. As a direct and proximate result of the conduct of the Defendants, Plaintiffs and members of the Class have suffered and continue to suffer a loss of quiet enjoyment of their property and/or leaseholds, including but not limited to the following:

   a. Loss of the use and enjoyment of their homes;

   b. Anxiety and stress from the circumstances resulting from the appearance of the sinkholes;

   c. Anxiety, fear, and associated stress from the potential that the underground pipelines may explode, due to Sunoco's negligence, when they had been repeatedly assured that the pipeline drilling process was a safe one and that danger would not be a concern;

   d. Fear and associated stress that Defendants and their agents have deceived the Plaintiffs as to their expertise, knowledge, safety, and compliance with law;

   e. Loss of their chance for a safe and secure home and property when Sunoco chose to install pipeline by HDD, which was contraindicated in this area;

   f. Loss of their chance for a safe and secure home and land, when Sunoco's agents elected to perform HDD and when it conducted the process of HDD in

a manner which was below the standard of care required of one installing a pipeline, which is intended to contain hazardous, explosive, and highly flammable substances;

g.  Unwanted visits of various contractors, and State regulators on their Property, while monitoring and remediation of the situation continues;

h.  Plaintiffs' lives have been seriously disrupted, including having to leave their home for a time, including inconvenience and expense;

i.  Invasion of their neighborhood by an endless parade of trucks from out of state;

j.  Invasion of their neighborhood by environmental regulators seeking to assess the risk of explosion from those in the blast zone of the existing natural gas pipeline;

k.  Invasion of their neighborhood by numerous backhoes and other heavy diesel machinery for purposes of evaluating the damage caused by Sunoco's negligence;

l.  Jackhammering in cul de sacs by Aqua Water Company to avoid possible collapse of the water and sewer lines;

m.  Travel of eight or more cement trucks through the neighborhood to remedy the sinkholes;

n.  Infusion of tons of cement like grout to fill areas of the subsurface of Lisa Drive caused by Sunoco's negligence; and

o.  Contamination of soil and groundwater by spilled petroleum type products and products of HDD;

13

78.   As a direct and proximate result of the conduct of the Defendants, the Plaintiffs and members of the class have suffered, or are likely to suffer in the future, physical damage to their property and/or leaseholds, including: (1) cracking, breaking or separation of walls, chimneys and other structural and decorative elements of their homes and businesses; (2) cracking, breaking or unexpected settling of driveways, sidewalks and other impermeable surfaces; (3) sinking and displacement of soil causing surface and subsurface disruption; (4) destruction of the grass and landscaping around their homes; and (5) deprivation of any future use of the underground for any personal use or purpose.

79.   As a direct and proximate result of the conduct of the Defendants, the Plaintiffs and members of the Class have suffered, or are likely to suffer in the future, the following:

   a.   Loss of the value of their investment in their property;

   b.   Loss of potential for future appreciation of their home and land;

   c.   Loss of past appreciation of the value of their home and land; and

   d.   Liability for the value of their home's mortgage without a saleable property to secure and pay off such mortgage;

## COUNT I
## NEGLIGENCE

80.   The preceding paragraphs are incorporated by reference herein.

81.   Defendants owed a duty of care to the Plaintiffs and members of the Class.

82.   Defendants owed the highest possible duty of care to the Plaintiffs and Members of the Class due to their status as a quasi-public entity and quasi-public utility.

83.   Defendants owed the highest possible duty of care to the Plaintiffs due to the Defendants performing HDD in the close confines of a highly concentrated residential neighborhood.

14

84.   Defendants breached their duty of care to the Plaintiffs and members of the Class.

85.   Defendants and their agents, servants or employees breached the duty of care they owed

to Plaintiffs and members of the Class by, among other things:

    a.   Deciding to use a method of drilling that was unsafe in the underground

       structures in the area around the Epicenter;

    b.   Deciding not to dig the pipeline by hand digging, which was previously

       proven successful;

    c.   Failing to recognize that using HDD through a known area of porous

       subsurface rock was more likely than not going to result in the formation of

       sinkholes;

    d.   Failing to identify that a fissure or void or other empty space lay in the path

       of the pipeline and was bound to result in explosions of mud and drilling

       fluid and sinkhole formation;

    e.   Failing to take adequate surveys and/or ground penetrating radar studies of

       the area at and around the Epicenter;

    f.   Failing to properly evaluate core borings prior to initiating and continuing

       HDD activities;

    g.   Failing to use proper drill heads due to a failure to appreciate the unique

       geologic qualities of the area;

    h.   Failing to use proper drilling technique due to a failure to appreciate the

       unique geologic qualities of the area;

    i.   Failing to obtain, consider, and adequately evaluate the findings of the

       geotechnical investigation report and its warnings;

j.   Failing to properly steer drilling in an area of weathered or fractured limestone, karst, or other subsurface porous rock;

k.   Failure to recognize and appreciate in a timely manner that using HDD in the area at and around the Epicenter would result in deflection and return of mud and fluid in such a manner as to cause sinkholes or rupture existing weaknesses in the subsurface;

l.   Failing to properly recognize that the location and depth selected for HDD would more likely than not impact the existing pipeline and cause an imminent risk of explosion;

m.  Failing to recognize that deflection or other inadvertent impact of the HDD was likely to impact water and sewer lines, Amtrak's train tracks, and other critical elements of residential infrastructure.

n.   Failure to perform appropriate testing of the soil borings at appropriate levels, distances and times during the preparation for and conduct of HDD.

o.   Failure to evaluate, analyze, and appreciate indications that sinkholes or other weaknesses or voids would result if the HDD continued through the area at or around the Epicenter;

p.   Failure to report and identify to supervising regulatory authorities, engineers, and geologists all inadvertent returns;

q.   Failure to maintain and implement plans including:

　　1.   Protection of adjacent structures plan;

16

    2. Pipe stress calculations including expected pipe stresses during pull back including bending, earth loads, buckling loads, and groundwater loads;

    3. Pullback calculations confirming maximum allowable safe pull back forces on the piping, as designated by the manufacturer, were not exceeded.

r. Failing to adequately bring to bear that level of skill, training, and expertise required of the Defendants and their geology and engineering specialists to comply with the standard of care required of such professionals;

s. Failing to adequately evaluate and use the findings of those studies of the subsurface geology to recognize that HDD would more likely than not cause damage to Plaintiffs and members of the Class;

t. Failure to take reasonable precautions against impairment of the ownership and leasehold rights of Plaintiffs and members of the Class and creation of a dangerous condition;

u. failure to warn Plaintiffs and members of the Class of the nature and extent of the dangerous condition;

v. failure to warn Plaintiffs and members of the Class of their negligence and inability to perform HDD in the neighborhood without harm being caused;

w. Failure to have an adequate emergency response to the creation of the dangerous conditions created by HDD;

x. Violation of applicable environmental laws, statutes, permits, and DEP and PUC orders and directives;

17

y.   Violation of consent orders issued by regulatory authorities.

86.   Defendants admitted that their manner of operating and drilling their pipelines violated environmental laws, statutes, prior orders, licenses, permits, and easements.

87.   As a result of this admission, the Defendants were required to pay and did pay a fine of $12 million dollars to Pennsylvania regulatory agencies.  This fine was not appealed or objected to.

88.   Only the Commonwealth benefited from the proceeds of the fine.

89.   No plaintiff enjoyed any compensation for their harms and losses as a result of the fine being paid.

90.   Defendants' negligence was committed in a wanton, reckless, and outrageous manner, with disregard for the rights, safety, and health of Plaintiffs.

91.   Defendants repeatedly promised that the use of HDD through this densely populated growing residential area was safe and effective.

92.   Defendants knew that there were extreme risks and dangers in the use of HDD in this locale.

93.   Defendants knew that there were safer methods, with proven reliability to lay pipe in this locale.

94.   Defendants disregarded the safety and land ownership rights of the Plaintiffs and chose an unsafe method to drill towards their intended target.

95.   Defendants have now agreed to utilize hand trench digging instead of HDD in West Whiteland Township.

96.   Plaintiffs and members of the Class suffered damages as a direct and proximate result of the negligence of Defendants, their agents, servants, or employees.

18

97.    Defendants violated numerous state environmental and safety laws applicable to their particular activity.

98.    The purpose of the various statutes, orders, and decrees which were violated was the protection of the public in general and the Plaintiffs and members of the class in particular.

99.    Violation of the statutes, decrees, and orders caused harm to the Plaintiffs and members of the Class.

100.   Defendants' willful violation of the laws of the Commonwealth constitutes negligence per se.  The resulting damage described in the paragraphs above was a proximate result of the violation of these environmental and safety statutes, rules, and regulations.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

## COUNT II
## NEGLIGENCE PER SE

101.   The preceding paragraphs are incorporated by reference herein.

102.   Defendants violated numerous state environmental and safety laws applicable to their particular activity.

103.   The Defendants committed repeated and egregious violations of the terms of permits issued by the Commonwealth of Pennsylvania.

104.   Further, the Defendants' negligent acts, as described herein, violated The Pennsylvania Solid Waste Management Act ("SWMA"), 35 PA. Stat. Sections 6018.101, et seq.

105.   Further, the Defendants' negligent acts, as described herein, violated The Pennsylvania Oil and Gas Act, 58 PA. Stat. Sections 601.101, et seq. to wit:

19

> It shall be unlawful for any person to:(1) Drill, alter, operate or utilize an oil or gas well or in violation of the rules or regulations adopted under this act, or orders of the department, or in violation of any term or condition of any permit issued by the department.(2) Conduct any activities related to drilling for, or production of, oil and gas, contrary to the rules or regulations adopted under this act, or orders of the department, or any term or any condition of any permit, or in any manner as to create a public nuisance or to adversely affect the public health, safety, welfare or the environment.

106.   Further, the Defendants' negligent acts, as described herein, violated The Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 PA. Stat. Sections 6020.101, et seq.

107.   Specifically, on dates on or after January 1, 2017, the Defendants' negligence caused or failed to prevent the discharge of drilling solution in an upland area.

108.   Drilling solution is an "industrial waste" under Section 301 of the Clean Streams Law, 35 P.S. Sections 691.301.

109.   It is undisputed that the Defendants' activities caused industrial waste to be spilled over members of the class' properties.

110.   This discharge caused sinkholes to develop.

111.   This discharge has the potential to pollute the waters of the Commonwealth.

112.   This discharge was followed by Defendants' failure to abide by the terms of the Permits issued to them by the Commonwealth.

113.   The purposes of these laws and the requisite legislative intent is intended to protect the citizens of this Commonwealth from the dangers of the improper disposal of hazardous and solid waste.

114.   These laws, therefore, are specifically designed to protect the members of the class outlined herein.

115.   The purpose of the various statutes, orders, and decrees, which were violated, was the protection of the public in general and the Plaintiffs and members of the class in particular.

116.    Violation of the statutes, decrees, and orders caused harm to the Plaintiffs and members of the Class.

117.    These laws each clearly apply to the Defendants.

118.    The Plaintiffs' properties reside less than 2500 feet from the Defendants' pipeline projects.

119.    The Plaintiffs have been grievously harmed by the defendants' violations of the above described acts, thus falling directly within the group of individuals that the act is intended to protect.

120.    The Defendants own and operate wells and conduct oil and gas drilling and exploration and specifically pipeline construction drilling to transport the products of their exploration.

121.    These acts cited above regulate all aspects of the Defendants' activities by prohibiting those very acts alleged to have caused harm.

122.    The Defendants were repeatedly cited, sanctioned, fined, lambasted and pilloried by their regulatory overseers for egregious violations of their permits and Pennsylvania law.

123.    Defendants' willful violation of the laws of the Commonwealth and its permits constitutes negligence per se.   The resulting damage described in the paragraphs above was a proximate result of the violation of these environmental and safety statutes, rules, and regulations.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

## COUNT III
## INCONVENIENCE AND DISCOMFORT

124. The preceding paragraphs are incorporated by reference herein.

125. Plaintiffs have suffered harm from Defendants' negligence, which has proximately resulted in inconvenience and discomfort in the form of interference with the class' peaceful possession of its real estate, as detailed in this Complaint.

126. Before the construction of the pipeline that caused destruction to the subsurface of Lisa Drive, the Plaintiffs enjoyed a lovely, peaceful, quiet, suburban neighborhood.

127. The destruction of the subsurface of Lisa Drive caused a massive influx of emergency repair crews, utility crews, pipeline engineers, and other associated personnel to evaluate and attempt to remediate the disaster.

128. This influx of personnel essentially destroyed the use and enjoyment of the neighborhoods of the plaintiffs.

129. This influx also destroyed the ability of class members to enjoy the peaceful possession of their properties.

130. Residents of Lisa Drive, Michelle Drive, and other nearby developments were prevented from their normal and usual enjoyment of their neighborhoods and developments as follows:

a. Walking in the areas affected by the negligence of the Defendants became intolerable due to the presence of many trucks, noise, water spillage, drilling, digging, and the uncertainty associated with being in proximity to a dangerous and unstable subsurface;

b. Living in the areas affected by the negligence of the Defendants meant enduring hours of high decibel noise, endless pump noise, and the operation of heavy equipment;

c. Living in the areas affected by the negligence of the Defendants meant enduring constant deluges of water down main thoroughfares, workmen in safety gear and hardhats guiding traffic, and constant interactions with police and environmental and governmental personnel;

d.  Living in the areas affected by the negligence of the Defendants meant enduring constant contact with land agents from the defendants, who were intimidating and unhelpful.

131.   This destroyed what was once a bucolic, peaceful neighborhood.

132.   Plaintiffs and members of the class have suffered damages in the form of inconvenience and discomfort as a direct and proximate result of the negligence of the Defendants, and their agents, servants, employees, contractors, and workmen.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

### COUNT IV
### PRIVATE NUISANCE

133.   The preceding paragraphs are incorporated by reference herein.

134.   Plaintiffs have suffered harm from Defendants' negligence, which has created a private nuisance, while exercising the right common to the general public, in the form of:

a.  The right to clean air, pure water, and the preservation of the natural, scenic, historic and aesthetic values of the environment under the Pennsylvania Constitution, Pa. Const. art. I, § 27;

b.  The right to clean, unpolluted water, soil and air;

c.  The right to be protected from threats to public health, safety and welfare; and;

d.  The right to exclusive possession and use of their property.

135.   Further, the Defendants' negligent acts in improperly selecting HDD to drill pipeline routes resulted in subsidence or sinkholes, inadvertent returns, and inundation by hazardous waste drilling fluids.

136.   Further, the Defendants' negligent acts resulted in the public spectacle of extreme danger from possible gas pipeline explosion, an influx of workers, regulators, and others responsible to evaluate the level of subsurface destruction to the area of the class Plaintiffs.

137.   The class members' anxiety regarding the potential explosion of this negligently drilled pipeline was further worsened by the explosion of a pipeline operated and installed by the defendants in Blair county, Pennsylvania during the pendency of this action.

138.   The negligent conduct of the Defendants has caused an irreparable and continuing harm to plaintiffs.

139.   The negligent conduct has caused over $20 million dollars of impairment of property value, the loss of the use and enjoyment of the neighborhoods surrounding the pipeline path, and inconvenience and discomfort, as described herein.

140.   The inconvenience and discomfort experienced by the Plaintiff class is significant as the plaintiffs were forced to endure months of remediation activity.

141.   The inconvenience and discomfort experienced by the Plaintiff class is also significant in that the class members have a valid, legitimate, and unrequited fear of future sinkholes and future explosions occurring in their neighborhood.

142.   Further, the Plaintiff class has already suffered and will continue to suffer a noticeable drop in property values attributable to the Defendants' creation of the nuisance of a negligently drilled and placed pipeline.

143.    Hence, as detailed above, the Plaintiffs and members of the class have suffered both severe past and future damage to their enjoyment of their neighborhoods and to their investment in their properties and future growth in value of their homes.  Each of these damages are a direct and proximate result of the private nuisance Defendants created.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

## COUNT V
## NEGLIGENT HIRING, TRAINING, AND SUPERVISION

144.    The preceding paragraphs are incorporated by reference herein.

145.    Defendants breached the duty of care they owed to Plaintiffs and members of the Class by, among other things, their decision to employ or use agents, employees, workmen, contractors, subcontractors, agents, and/or other personnel to conduct surveying and drilling with HDD who were:

   a.   Not properly trained to perform such tasks;

   b.   Not properly credentialed or certified to perform such tasks;

   c.   Not properly supervised in the performance of such tasks;

   d.   Not properly hired in that they were not properly trained or credentialed to perform those tasks for which they were hired or employed;

   e.   Not educated in the legal requirements needed to effectively perform their responsibilities under pertinent statutes;

f.   Not properly licensed to perform such activities in the Commonwealth of
Pennsylvania;

g.   Not properly experienced in the use of HDD through limestone, karst,
borders between various rock formations and types, and through porous
geology;

h.   Not properly supervised in the use of HDD through limestone and other
porous geology;

i.   Not properly supervised in the course of HDD activities to recognize the
obvious dangers of the planned path of the pipeline;

j.   Not properly supervised in how to communicate properly and effectively
across geology and engineering and other specialties to allow for an effective
and proper evaluation of the risks inherent in the initiating and continuing
HDD operations;

k.   Failing to heed warnings raised by professionals regarding the course of the
Defendants' HDD activities.

l.   Failing to abide by their own policies and procedures;

m.   Failing to abide by standards of practice or other standards for performing
HDD in highly concentrated areas;

n.   Not properly credentialed, experienced, or trained in the use of HDD of the
length of pipe contemplated at the West Whiteland Township pipeline
location and not experienced in managing the gauge or width of piping called
for in this project.

146.    Defendants' aforementioned acts and omissions were committed in wanton, reckless and outrageous disregard for the rights, safety and health of Plaintiffs and members of the Class.

147.    Plaintiffs and members of the Class have suffered damages as a direct and proximate result of the negligent hiring, training, and credentialing by Defendants.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

## COUNT VI
## LOSS OF SUBJACENT SUPPORT

148.    The preceding paragraphs are incorporated by reference herein.

149.    Plaintiffs have a right to subjacent support.

150.    Defendants' HDD caused the ground owned by Plaintiffs or abutting Plaintiffs homes and neighborhoods to suffer a loss of subjacent support.

151.    The loss of subjacent support has resulted in damage to Plaintiffs' property, leaseholds, and property values.

152.    The damage caused by Defendants' HDD is continuing and ongoing.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.

## COUNT VII
### LOSS OF LATERAL SUPPORT

153.  The preceding paragraphs are incorporated by reference herein.

154.  Plaintiffs have a right to preservation of lateral support.

155.  Defendants utilized an easement to bore pipeline pathways through easements granted to them by members of the class.

156.  Hence, the Defendants were in possession of the property on which they were operating at the time of the events described above.

157.  Due to the negligence of the Defendants in their use of the easement granted to them, the land comprising the easement suffered damage and subsidence and sinkholes and other damage to be determined.

158.  Due to the negligence of the Defendants, Plaintiffs' real property suffered damage.

159.  Due to the negligence of the Defendants, huge amounts of flowable concrete grout were needed to fill holes or subsidences or sinkholes in the vicinity of the Plaintiffs' easements.

160.  Due to the negligence of the Defendants, it is more likely than not that future damage will occur to the area of the easements granted by the Plaintiffs and class members.

161.  Due to the negligence of the Defendants, it is more likely than not that neighboring properties will suffer and incur damage caused by the loss of lateral support resulting from the Defendants' use of HDD.

162.  Defendants' HDD caused the ground owned by Plaintiffs or abutting Plaintiffs' homes and neighborhoods to suffer a loss of lateral support.

163.  The loss of lateral support has resulted in damage to Plaintiffs' property, leaseholds, and property values.

164.  The damage caused by Defendants' HDD is continuing and ongoing.

    **WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, in an amount in excess of fifty thousand ($50,000) dollars, together with costs, punitive damages and any other relief the Court deems appropriate.


Respectfully submitted,

**NEUWIRTH LAW OFFICE, LLC**


**Date:** October 23, 2018         **By:**    */s/ Andrew T. Neuwirth*
                                      Andrew T. Neuwirth, Esquire
                                        ID No.: 310079
                                        2200 Renaissance Blvd., Suite 270
                                        King of Prussia, PA 19406
                                        P. 215-259-3687, F. 215-253-581
                                        andrew@neuwirthlaw.com


**ROBSON & ROBSON, P.C.**


**Date:** October 23, 2018         **By:**    */s/ Edward S. Robson*
                                        Edward S. Robson, Esquire,
                                        ID No.: 307381
                                        2200 Renaissance Boulevard, Suite 270
                                        King of Prussia, PA 19406
                                        P. 610-825-3009, F. 610-825-2620
                                        erobson@robsonlaw.com